[No. 27042. Department One. August 15, 1938.]

SARAH M. ALVERSON, *Respondent,* v. KANSAS CITY LIFE INSURANCE COMPANY, *Appellant.*[1]

[1]Reported in 82 P. (2d) 149.

*Pedigo, Watson & Gose,* for appellant.

*E. L. Casey,* for respondent.

GERAGHTY, J.—This action was instituted by the plaintiff, Sarah M. Alverson, against the defendant, Kansas City Life Insurance Company, to recover on a policy of insurance issued by the defendant upon the life of her son, Marvin C. Alverson, in which she was the named beneficiary.

The policy, written July 21, 1936, was for the sum of one thousand dollars, but provided for payment of double indemnity in case of the accidental death of the insured. It provided, also, that death by self-destruction within one year, whether the insured be sane or insane, would limit the liability of the company to the amount of premium paid by the insured.

On October 18, 1936, the insured died as the result of a gunshot wound. The insurance company, taking the position that the death of the insured was self-inflicted, refused to pay the policy and tendered return of the premium paid by the insured.

The cause was tried to a jury, and a verdict was returned in favor of the plaintiff for two thousand dollars, double the face of the policy, with accrued interest. The defendant insurance company appeals.

The appellant assigns error upon the admission of certain testimony, the giving and refusal of certain instructions, and the denial of its motion for a new trial upon the ground that the verdict was against the weight of the evidence. We shall first consider appellant's last assignment.

The sole question of fact in the case is whether the death of the insured was the result of accident or of an intentionally self-inflicted wound. At the beginning of the case, counsel for appellant stated that, the presumption being against suicide, the burden of proving that the wound causing the insured's death was intentionally self-inflicted rested upon the appellant, and requested permission to open and close the case, which procedure was followed.

Young Alverson was twenty-two years of age. He had graduated from high school two years before his death. He was ambitious to attend college and, possessing some athletic ability, hoped that this would assist him in doing so. He had worked in a civilian conservation camp until March or April, 1936, when he returned to the home of his parents at Prescott, in Walla Walla county. He worked in a warehouse for a time during the summer of that year, and, on October 6, 1936, was employed to help with the fall seeding on a farm about seventeen miles from Prescott operated by Mrs. Reese. He was driven to the farm by Mr. Barnum, the foreman, on the late afternoon of that day, and assigned to a room in a cookhouse adjoining the farm house.

The room was well stocked with firearms, including a .22 special Winchester and, at least, three shot guns. The hunting season was open at the time, and, also, the men on the farm were accustomed to shooting hawks, as well as rats, which infested the premises. Shortly after Alverson was assigned to his room, a shot was heard, and, on inquiry, he explained that he was "fooling" with the .22 Winchester, and it went off accidentally.

As the foreman was not ready to commence seeding at that time, he drove Alverson back to Prescott the next day. Alverson returned to the farm on October

13th, and worked from Wednesday until Saturday. While arranging the room occupied by Alverson, on his first visit to the farm, Mrs. Reese found two cartridges for the rifle on a dresser and placed them in a drawer, where Alverson later placed some of his clothing. After Alverson's return on the 13th, Barnum inspected the Winchester and found that no cartridges were in its barrel or magazine.

On Sunday morning, the foreman drove to Prescott, accompanied by Alverson. They intended to return by noon. On arriving at Prescott, Alverson went to the home of his parents to get some clothes. The foreman purchased groceries and a box of shells for each of the guns on the ranch. Later, they met at a poolhall. Alverson met some acquaintances, and a couple of hours were spent there; they drank some beer and wine. Alverson engaged in a quarrel with some of the young men there, and blows were struck. After this difficulty was composed, Barnum and Alverson drove a young man named Fine to his home. Fine, however, returned with them to the poolhall. Later, Alverson took the car for the purpose of returning Fine to his home a second time. In the course of this drive, the car turned over, whether as the result of reckless driving, loose gravel on the road, or a defective tire, is not certain from the record.

The car was not seriously damaged. When righted, it was found a tire had to be replaced. The groceries and cartridges purchased by Barnum had been placed in the car. After the accident, the groceries were found in the car, but the cartridges were gone. Alverson was greatly disturbed by this accident, and is quoted as saying he wished he had broken his neck. He expressed his regret to Barnum and worried about the damage to the car. Barnum told him the damage was not great and that the car was insured. They returned to the

farm at eight o'clock at night and, after bidding each other good night, Alverson went to his sleeping quarters.

About five o'clock the next morning, when Barnum went to call Alverson, he found the light burning and, on entering the room, saw that he was dead. He was fully clothed and lying on his back across the bed, with his feet on the floor

" . . . as if you would go into your room and were tired and laid down across the bed. His feet were on the floor and he was lying back on the bed with both hands on his stomach. I observed the gun then; it was leaning against the bed, about one foot from his leg. The gun was on his left side, close to his left side and the magazine was away from him. I did not then observe the gun. I opened the door and that was as far as I got. He was dressed in his work shoes, a pair of pants, a leather jacket, a shirt and a hat, just the way he returned from town."

Dr. Hardy, who accompanied the sheriff and deputy prosecuting attorney to the Reese farm, testified that the Winchester rifle was leaning against the bed, with the butt on the floor, perhaps six or eight inches from the left leg. The decedent's feet were on the floor, his body lying across the bed. His hat was on. His hands were across the lower abdomen. When the doctor saw the body, at about half past seven, it was cold, indicating that death had occurred at least several hours before. From the nature of the wound, he would say that death probably was instantaneous, and, if so, the decedent would have no control of himself after the bullet entered the brain.

The testimony of Mr. Gillis, deputy prosecuting attorney and coroner, was substantially the same as that of Dr. Hardy's as to the condition of the room and the positions of the body and rifle. He was present when the wound was probed by a surgeon, after the body

had been brought to town. It was probed with a small wire, which went in easily and then stopped. The direction of the wound was slightly upward. As to powder burns, he didn't think there were many, if any. He looked for them, and there was some blood around the head, but he couldn't say about the powder burns.

Sheriff Woodward testified there was no disarrangement of the room. He examined the room and the outside premises, but found nothing to indicate foul play. On examining the rifle, he found one discharged shell in it; another undischarged shell was found on the dresser or in the drawer. He was present when the wound was probed. It ranged straight across and a little bit up. He did not observe any powder burns on Alverson's head.

Different theories might be advanced as to how the rifle could have been discharged. It was for the jury to say, after consideration of all the evidence, whether it was discharged accidentally or intentionally by the decedent.

The strongest motive assigned for the theory of suicide was Alverson's extreme disgust with himself for his doings on the Sunday afternoon in Prescott, and, possibly, for other escapades. There is evidence in the record that, about the first of October, he had been confined in the jail at Waitsburg a few hours for drunkenness, and later sent home. He otherwise appears to have been a young man ambitious to educate himself and improve his condition. He was attached to his mother and, as some of the witnesses testified, generally well tempered except when drinking. He might have deliberately shot himself under the compulsion of remorse; on the other hand, it was possible that he might again, as on the first evening when assigned to his room, have "fooled" with the rifle and inserted the undischarged cartridge lying in the dresser. It cannot be

said that the weight of the evidence was against the jury's verdict.

■ Appellant's local insurance agent was called by the respondent as a witness and, over appellant's objection, was permitted to testify as to a former policy of insurance written by the appellant upon the life of the decedent, his mother being the named beneficiary. This policy, for two thousand dollars, was written in the summer of 1934. Like the policy here involved, it provided for double indemnity in case of accidental death. It lapsed after a year for nonpayment of premium. The testimony was offered by respondent as tending to rebut any suggestion of a purpose on the decedent's part to defraud the appellant. The appellant, in its case in chief, covered a wide range for the purpose of showing the general character, conduct, and disposition of the decedent.

In cases of this kind, a large discretion must be allowed to the court. Certainly, in view of the wide range allowed the appellant in making its case, it was not unreasonable for the court to permit this testimony; and, in any event, it was negative in character and could not have been prejudical.

■ Appellant's next assignment is based on the refusal of the court to give a requested instruction informing the jury that suicide is an affirmative defense and must be established by a preponderance of the evidence, and the giving instead of the following instruction:

"In the absence of evidence to the contrary the law presumes that no one will commit suicide. Therefore suicide as a defense, limiting plaintiff's recovery, must be affirmatively shown by the party asserting it.

"So, in this case, the burden is upon the Defendant to establish to your *satisfaction, by a preponderance of the evidence,* that the death of Marvin C. Alverson was

not accidental and unintentional but that he committed suicide.

"If the evidence satisfied you that he committed suicide, then plaintiff is entitled to recover only the sum of $24, the amount of the premium paid on the policy.

"If the evidence does not satisfy you that he committed suicide, then plaintiff is entitled to recover the sum of $2,000 principal and $123.67, interest, or a total of $2,123.67.

"The burden is upon the defendant to prove that Marvin committed suicide." (Italics ours.)

The appellant contends that the employment of the word "satisfaction" imposed upon appellant a greater burden of proof than "a preponderance of the evidence."

We see no merit in this contention. In disposing of a similar contention, this court, in *Carstens v. Earles,* 26 Wash. 676, 67 Pac. 404, quoted from *Callan v. Hanson,* 86 Iowa 420, 53 N. W. 282, as follows:

"Objection is made to the use of the word 'satisfied' in the sixth instruction. It will be observed that the connection in which the word is used is such as to clearly show that it is used to convey substantially the same thought as 'find' or 'believe.' Thus, 'if from a preponderance of all the evidence you are satisfied,' etc. Clearly the jury could not have understood that the word 'satisfied' was used in any other or different sense than if the word 'believe' had been substituted for the words 'are satisfied.' There can be no good reason for claiming that in the connection in which the word is used it was misleading or erroneous."

Error is assigned on the refusal of the court to give appellant's requested instruction No. 2. The substance of this requested instruction was embodied in the quoted instruction given by the court.

Finding no error in the record, the judgment is affirmed.

Steinert, C. J., Main, Holcomb, and Simpson, JJ., concur.